Thompson Law Office, LLC
Colin M. Thompson
2nd Floor, J.E. Tenorio Building
PMB 917 Box 10001
Saipan, MP 96950
Telephone: (670) 233-0777
Facsimile: (670) 233-0776

*Attorney for Plaintiff*
*Lieutenant Colonel Robert L. Gay*

FILED
Clerk
District Court

APR 19 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| LIEUTENANT COLONEL ROBERT L. GAY,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS PUBLIC SCHOOL SYSTEM and DOES 1-10,<br><br>Defendant. | CIVIL CASE NO. 16-_____<br><br>CV 16-00013<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff LIEUTENANT COLONEL ROBERT L. GAY hereby files this complaint against Defendant COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS PUBLIC SCHOOL SYSTEM on the following grounds:

### NATURE OF THE ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("**Title VII**") to correct unlawful employment practices on the basis of race, national origin, and retaliation. As alleged below, Defendant Commonwealth of the Northern Mariana Islands School System ("**PSS**") unlawfully subjected Plaintiff Lieutenant Colonel Robert L. Gay ("**Col. Gay**") to unlawful discrimination based on his race

and national origin, thereby creating a hostile work environment. Col. Gay further alleges that PSS retaliated against Col. Gay after Col. Gay complained to the Equal Employment Opportunity Commission ("**EEOC**") regarding the unlawful discrimination occurring at PSS.

## JURISDICTION AND VENUE

2.      The United States District Court for the Northern Mariana Islands has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e-5(f)(1), (3).

3.      Venue in this Court is proper pursuant to 28 USC § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

## PROCEDURAL PREREQUISITES

4.      Col. Gay has satisfied all required procedural conditions prior to instituting this lawsuit.

5.      On or about March 28, 2014, the EEOC acknowledged receiving a charge of discrimination from Col. Gay, against PSS, based on hostile working environment.

6.      PSS received notice of the first Charge of Discrimination on April 8, 2014.

7.      On or about January 29, 2016, the United States Department of Justice issued a Notice of Right to Sue based on the hostile work environment claim which Col. Gay's attorney received on or about February 19, 2016.

8.      On or about November 2014, the EEOC acknowledged receiving a charge of discrimination from Col. Gay, against PSS, this time based upon retaliation.

9.      PSS received notice of the second Charge of Discrimination on November 2014.

10. On or about January 29, 2016, the United States Department of Justice issued a Notice of Right to Sue based on the retaliation claim which Col. Gay's attorney received on or about February 19, 2016.

## PARTIES

11. Col. Gay is a United States citizen who, at all relevant times, lived and worked in the Commonwealth of Northern Marianas Islands.

12. PSS employed Col. Gay as the Director of Army Instruction ("**DAI**") of the Junior Reserve Officer's Training Corps. ("**JROTC**") for PSS from February 2007 through February of 2012 as the DAI.

13. PSS employed Col. Gay as DAI a second time, starting in October 2012 and continuing through January 2016.

14. At all relevant times, PSS has continuously been, and is now, a Commonwealth of the Northern Mariana Islands non-profit corporation charged with administering the Commonwealth's preschool, elementary, and secondary programs.

15. At all relevant times, PSS was an "employer" as defined by 42 U.S.C. § 2000e(b), (g), and (h) because PSS has continuously been and is now engaged in an industry affecting commerce and has at least 15 employees.

16. Col. Gay is ignorant of the true names and capacities of Does 1-10. Therefore, Col. Gay is suing the Doe defendants using fictitious names. Col. Gay reserves the right to amend the complaint to name one or more Doe defendants at the time Col. Gay learns their true identities.

17. On information and belief, all of the acts and omissions alleged in this complaint were undertaken by and are attributable to PSS and the DOE defendants, each acting as successor, agent, employee, or under the direction and control of the other

defendants. Col. Gay further alleges that all alleged acts and failures to act were within the scope of each agency and employment relationship and that each of PSS and the DOE defendants participated in, approved, or ratified each of the unlawful acts or omissions alleged in this complaint. Whenever this complaint refers to an act or omission undertaken by PSS, unless specified otherwise, the act or omission will be deemed to be the act or omission of PSS and each of the DOE defendants, acting individually, jointly, and severally.

## FACTUAL BACKGROUND

18. From February 2007 through February 2012, Col. Gay served as the DAI for the CNMI.

19. Col. Gay returned to the CNMI and again served as DAI in October 2012.

20. The DAI is in charge of the entire JROTC program within the CNMI.

21. The Director of JROTC United States Army Cadet Command ("USACC") confirms all DAIs.

22. A DAI must successfully serve for two years as a Senior Army Instructor ("**SAI**") before the USACC will consider a candidate for a DAI position.

23. The governing authorities of a school where a JROTC is established must promise to agree to a policy of nondiscrimination based on race, sex, or national origin, among others, with respect to admission of qualified studies and the treatment of students and instructors.

24. In particular, failure to adhere to these policies constitutes a violation of federal United States Army Regulations, USACC regulations, and the contract between USACC and a school system that participates in the JROTC program.

25. Col. Gay served as DAI from February 2007 through February 2012 and again from October 2012 through June 2013 without interference by the Board of Education

("**BOE**"), the Charmain of the BOE, Herman T. Guerrero ("**Chairman Guerrero**"), or the Commissioner of Education, Dr. Rita A. Sablan ("**Commissioner Sablan**").

26. The BOE is a five-member board tasked with formulating policy and exercising control over PSS through the Commissioner of Education.

27. The Commissioner of Education is the chief executive officer for PSS and is appointed by the BOE.

28. Col. Gay returned to the CNMI in October 2012 to resume his duties as DAI.

29. The 8th Brigade, US Army Cadet Command was satisfied with Col. Gay's performance as DAI from February 2007 through February 2012 and again from October 2012 through January 2016.

30. Sometime during late July or early August 2013, USACC informed the BOE that USACC was going to put the Rota High School JROTC program on probation because the Rota JROTC program lacked a qualified SAI.

31. According to USACC regulations, an SAI must be a commissioned officer with a four-year degree.

32. During the 23+ years that the Rota JROTC program has been in existence, the Rota JROTC program never had a qualified commissioned officer with a four-year degree to serve as SAI because Rota program is extremely remote.

33. USACC was previously exempted the Rota JROTC program from the SAI requirement, but in or about 2012, the SAI requirement for the Rota JROTC program was initiated.

34. Commissioner Sablan, and other members of the BOE, including Chairman Guerrero, told other people that BOE was holding Col. Gay personally responsible because the USACC placed the JROTC program on probation.

35. This was a pretext used by the BOE to justify removing Col. Gay from the DAI position in order that an unqualified Chamorro man, Retired Colonel Harry Blanco ("**Col. Blanco**"), could take Col. Gay's position as DAI.

36. In reality, Chairman Guerrero, Commissioner Sablan, the BOE, and other PSS leadership personnel were responsible for the Rota JROTC's probationary status because their prejudicial conduct and hostility toward non-Chamorros.

37. PSS's efforts to remove Col. Gay from the DAI position began when Col. Blanco told Chairman Guerrero, sometime between September and October of 2013, that Col. Blanco was returning to the CNMI in February 2014.

38. Col. Blanco quickly made clear that he wanted to be the DAI for the CNMI JROTC district when he applied for the CNMI DAI position in October 2013, even though Mr. Col. Gay's DAI contract was not set to expire until October 2014.

39. Federal regulations require that, in order to qualify for a DAI position, a person must first serve as an SAI for two years with a high school JROTC program.

40. Col. Blanco was not qualified to be a DAI because he never served as SAI for two years as required by federal regulations.

41. Col. Blanco did not offer to serve as the SAI on Rota nor did he offer to serve as the SAI for anywhere else, despite being offered a pathway to the DAI position by federal JROTC program coordinators through the USACC 8th Brigade located in Fort Lewis, Washington.

42. Col. Blanco's anticipated return to the CNMI caused Chairman Guerrero, the members of the BOE, Commissioner Sablan, and Commissioner Sablan's staff members to engage in an increasing amount of harassment, intimidation, and racism directed toward Col. Gay, because Col. Gay is white and not Chamorro, with the purpose of

causing Col. Gay to leave his DAI position so that Col. Blanco, a Chamorro man, could take Col. Gay's position as DAI.

43. During September 2013, Col. Gay met with Commissioner Sablan regarding the fact that the USACC placed the Rota JROTC program on probation.

44. During this meeting, Commissioner Sablan yelled at Col. Gay in a denigrating manner.

45. During November 2013, Col. Gay met with Commissioner Sablan blaming Col. Gay for the fact that the USACC has placed the Rota JROTC program on probation.

46. During that meeting, Commissioner Sablan repeatedly harassed Col. Gay by repeatedly informing Col. Gay that Chairman Guerrero was upset that the USACC placed the Rota JROTC program on probation.

47. Commissioner Sablan continued harassing Col. Gay in her attempt to remove Col. Gay as DAI by repeatedly questioning Col. Gay's credential's to serve as the DAI and asking Col. Gay why she needed him and why was he still working for PSS.

48. Instead, Commissioner Sablan used the meeting to harass and intimidate Col. Gay and to attempt to force Col. Gay to resign so that Col. Blanco could become the DAI for the CNMI.

49. In December 2013, a member of the BOE informed Col. Gay that the new human resources officer was not allowed to speak with Col. Gay unless Commissioner Sablan was present.

50. On Friday December 23, 2013, Col. Gay attempted to speak with the human resources officer.

51. After Col. Gay waited for over 30 minutes, the human resource officer's clerk told Col. Gay that the human resources officer was too busy to speak with Col. Gay despite the fact that PSS was then on Christmas break.

52. Col. Gay's position as the DAI requires him to correspond with the PSS human resources office on a regular basis.

53. PSS cannot comply with federal laws and regulations unless PSS human resources offices communicates with Col. Gay and the rest of Col. Gay's office.

54. At the beginning of February, 2014, Commissioner Sablan called a meeting in which she stated that she had "made up her mind" and that she was reassigning Col. Gay to the Rota JROTC program for five months.

55. This proposed assignment was a breach of Col. Gay's contract with PSS and violated JROTC regulations.

56. Commissioner Sablan's assignment would have prevented Col. Gay from fulfilling his DAI responsibilities to the federal government and would have caused immense financial hardship to Col. Gay.

57. Commissioner Sablan did not attempt to assign anyone other than Col. Gay to manage the Rota JROTC program.

58. Col. Gay confirmed with other PSS leadership officials that no program director has ever been reassigned to Rota for an extended period of time.

59. After the February meeting, Commissioner Sablan directed Col. Gay's immediate supervisor, Associate Commissioner of Instructional Services, Jackie Quitugua (Ms. Quitugua), to undermine Col. Gay.

60. Ms. Quitugua called and emailed Col. Gay's federal supervisors at the 8th Brigade in Fort Lewis, Washington and questioned them regarding Col. Gay's performance and insinuated that Col. Gay was doing a poor job as the DAI of the CNMI District.

61. Ms. Quitugua's phone calls and emails to the 8th Brigade were designed to harass Col. Gay to Col. Gay's federal supervisors in order that Col. Gay be removed from the DAI position.

62. Col. Gay reported the conduct of Chairman Guerrero, Commissioner Sablan, Ms. Quitugua, and other PSS leadership to the EEOC on March 23, 2014.

63. Immediately after PSS received a copy of Col. Gay's EEOC complaint, PSS leadership, including Chairman Guerrero, Commissioner Sablan, Ms. Quitugua, and others, ceased almost all communication with Col. Gay and Col. Gay's staff.

64. The lack of communication was motivated by retaliation because Col. Gay filed an EEOC complaint and made it extremely difficult for Col. Gay to complete his job duties as the DAI for the CNMI.

65. In March 2014, Chairman Guerrero, Commissioner Sablan, and other PSS staff further retaliated against Col. Gay by misappropriating thousands of dollars from a special fund set aside for the JROTC program by Commonwealth law, to fund a one-week trip taken by Ms. Quitugua and Col. Blanco to meet with Col. Gay's immediate USACC supervisors at the 8th Brigade, in Fort Lewis, Washington.

66. The purpose of the meeting between PSS and USACC was to undermine Col. Gay to Col. Gay's immediate USACC superiors at the 8th Brigade and to convince the USACC to waive the two-year SAI requirement in order that Col. Blanco be permitted to become the DAI for the CNMI.

67. In addition, Chairman Guerrero, Commissioner Sablan, and other PSS staff took $5,000 each month from the JROTC fund in order to hire Col. Blanco as a JROTC consultant based on Col. Blanco's alleged "JROTC expertise."

68. Col. Blanco had no JROTC expertise whatsoever prior to the date on which PSS hired him as its "expert" consultant.

69. Chairman Guerrero, Commissioner Sablan, and other PSS staff ostensibly hired Col. Blanco to ensure that the CNMI JROTC program complies with federal laws and regulations, which is a core part of Col. Gay's responsibilities as the DAI.

70. By hiring Col. Blanco as a consultant, Chairman Guerrero, Commissioner Sablan, and other PSS staff attempted to give Col. Gay's job responsibilities to Col. Blanco.

71. When it came time to renew Col. Gay's contract with PSS, PSS failed to follow its own policies regarding the hiring process as a matter of further harassment and retaliation.

72. Col. Gay's contract was to expire on October 25, 2014.

73. In accordance with PSS regulations, Col. Gay submitted his request for renewal of his contract on April 16, 2014, more than six months prior to the expiration of the contract.

74. PSS regulations require that PSS provide notice of intent to renew or not renew a contract at least 90 days prior to the date on which the contract terminates.

75. PSS did not provide the required notification.

76. PSS failed to provide any performance rating appraisal regarding Col. Gay's performance as DAI from his direct supervisor, Ms. Quitugua at any time during the relevant rating periods until Col. Gay brought PSS's failure to follow its own regulations to PSS human resources personnel.

77. Col. Gay did not receive a notice of renewal or non-renewal, nor did Col. Gay receive a new employment contract prior to October 25, 2014, the day on which Col. Gay's contract was set to expire.

78. In July 2014, Col. Gay learned that PSS intended to offer Col. Gay a one year contract instead of a two-year contract as a matter of harassment and retaliation.

79. PSS regulations require two-year contracts for program managers, including the DAI position.

80. All of the other program managers with PSS have received two-year contracts.

81. Col. Gay received four inconsistent performance appraisals from PSS, each filed after March 23, 2014, the date on which Col. Gay filed his first EEOC complaint. These performance appraisals demonstrate PSS intention to discriminate and retaliate against Col. Gay.

82. Col. Gay received the first performance appraisal on July 1, 2014.

83. That appraisal listed five job duties and contained no evaluator comments.

84. Col. Gay received his second performance appraisal on July 9, 2014.

85. The second appraisal listed 15 job duties and contained no evaluator comments.

86. Col. Gay received a third performance appraisal on October 24, 2014, the day before Col. Gay's contract expired.

87. That appraisal listed 20 job duties and contained evaluator comments from Col. Gay's immediate supervisor, Ms. Quitugua.

88. The evaluator comments made by Ms. Quitugua were extremely negative and comprised numerous false statements that were similar to statements made about Col. Gay by various PSS leadership personnel. These negative statements were motivated by racial animus and retaliation for filing an EEOC charge.

89. On October 28, 2014, three days after Col. Gay's contract expired, Col. Gay received a 4th performance appraisal which was emailed to him by one of PSS's human resources officers.

90. The final appraisal contained a number of job duties that were different than the job duties in the first through third appraisals.

91. The final appraisal also included comments by Ms. Quitugua which, instead of being negative, were now effusive with praise for Col. Gay's performance as DAI.

## CAUSE OF ACTION I:

## HARASSMENT BASED ON RACE

92. Col. Gay realleges and incorporates paragraphs 1-91.

93. Col. Gay is a Caucasian man from the State of Hawaii.

94. Col. Gay served as the DAI for the JROTC program with PSS, without incident, from February 2007, to February 2012, a period of five years.

95. PSS rehired Col. Gay in October 2012, to serve as the DAI for PSS, for a period of two years, through October 2014.

96. Col. Gay served as the DAI, again without incident, until about June 2013.

97. In June 2013, Col. Gay met with Col. Blanco on Saipan.

98. During the meeting with Col. Blanco, Col. Blanco inquired extensively about the CNMI JROTC program, and insinuated that he could have Col. Gay removed or demoted from the DAI position.

99. This conversation led Col. Gay to conclude that Col. Blanco wanted Col. Gay's DAI position and that PSS wanted to remove or demote Col. Gay.

100. In October 2013, Col. Gay learned that PSS allowed Col. Blanco, a Chamorro man, to apply for Col. Gay's DAI position, even though the position was not open, and even though Col. Blanco was unqualified to serve as the DAI for the CNMI.

101. PSS allowed Col. Blanco to skirt the normal application process and submit his application to Chairman Guerrero.

102. Thereafter, PSS, through Chairman Guerrero, various members of the BOE, Commissioner Sablan, Col. Gay's direct supervisor Ms. Quitugua, and various other employees of PSS, engaged in a campaign of harassment designed to force Col. Gay to resign from his position as a DAI in order to enable Col. Blanco to become the DAI for the CNMI.

103. The harassment, which began in June 2013, continued on, even after Col. Gay's contract expired in October 2014.

104. Each of these incidents was unwelcome because Col. Gay did not initiate any of the complained of conduct perpetrated by Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua and because Col. Gay regarded the conduct as offensive and racially motivated.

105. During and after September 2013, the conduct of Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua was sufficiently severe and pervasive so as to alter the conditions of Col. Gay's employment with PSS by creating a work environment that was hostile to Col. Gay because Col. Gay was Caucasian and not Chamorro.

106. As a result of the actions undertaken by Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua, Col. Gay felt uncomfortable each day that he provided services to PSS, Col. Gay's ability to perform his services as the DAI was impaired, and Col. Gay's reputation suffered, both at PSS, and with Col. Gay's federal supervisors with the USACC.

107. In addition, the actions undertaken by Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua, aggravated and exacerbated Col. Gay's preexisting PTSD condition which caused Col. Gay extreme emotional distress.

108. As a result, Col. Gay sought medical treatment for his PTSD, treatment that would have been unnecessary but-for the hostile work environment created by PSS leadership.

109. Col. Gay perceived the working environment at PSS to be hostile.

110. A reasonable man in Col. Gay's position would have considered the Col. Gay's working environment to be hostile.

111. PSS intentionally created the hostile work environment in order to ensure that Col. Gay knew that Col. Gay was no longer welcome at PSS, and to force Col. Gay to resign from the DAI position so that the position could be given to Col. Blanco, a Chamorro man.

112. PSS created the hostile work environment with malice, or alternatively, with reckless indifference for Col. Gay's federally protected rights.

113. As a result of actions taken by Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua, Col. Gay suffered irreparable injuries, including but not limited to emotional distress, medical expenses, and other damages for which PSS should compensate Col. Gay.

## CAUSE OF ACTION II:

## RETALIATION

114. Col. Gay realleges and incorporates paragraphs 1-113.

115. Col. Gay engaged in activity protected by Title VII when he filed an intake questionnaire with the EEOC on March 10, 2014, alleging that PSS, particularly Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff, including Ms. Quitugua particularly were discriminating against Col. Gay based upon Col. Gay's race and national origin and asking that the EEOC take action against PSS.

116. Because PSS received a *Howecki* notice of Col. Gay's EEOC claim on April 8, 2014, PSS was aware of Col. Gay's claims after that date.

117. Starting after April 8, 2014, the date on which PSS received notice of Col. Gay's charge of discrimination, PSS ceased all communication with Col. Gay's staff.

118. In particular, Chairman Guerrero, Commissioner Sablan, the BOE, and other BOE staff including Ms. Quitugua, PSS human resources, and other PSS employees.

119. This lack of communication made Col. Gay's job substantially more difficult.

120. PSS paid Col. Blanco in order that Col. Blanco take over a part of Col. Gay's DAI job responsibilities, in violation of federal law.

121. In order to further retaliate against Col. Gay, Chairman Guerrero, Commissioner Sablan, Ms. Quitugua, and other PSS employees fraudulently misappropriated $5,000.00 per month from the JROTC account in order to pay Col. Blanco for expertise that Col. Blanco does not possess.

122. As further retaliation against Col. Gay, PSS leadership, including Ms. Quitugua, threatened Col. Gay's employees by informing them that they were doing a bad job and that they would be immediately reassigned to other PSS programs throughout the Commonwealth.

123. In reality, these employees were performing in an exceptional manner.

124. PSS further refused to honor its own rules regarding non-certified hirings.

125. In particular, PSS failed to notify Col. Gay of PSS's intention to renew or not renew his employment contract.

126. PSS did not provide Col. Gay with appropriate performance appraisals, nor did Ms. Quitugua ever discuss Col. Gay's duties, responsibilities, standards, or accomplishments at any time during Col. Gay's 2-year contract.

127. Although PSS did eventually provide Col. Gay with four performance appraisals, two appraisals contained no substantive evaluations, the third appraisal contained false statements, and the fourth performance appraisal, delivered October 28, 2014, contained statements which indicate that the statements in the third performance appraisal were false statements.

128. Col. Gay's last day of work under contract was to be October 25, 2014.

129. Col. Gay continued to work for PSS even though PSS did not provide him with a new employment contract.

130. While Col. Gay was employed by PSS, all other program managers whose employment contracts expired received two-year renewal contracts, except for Col. Gay.

131. As a result of PSS retaliation, Col. Gay suffered injuries, including but not limited to emotional distress, a worsening of his PTSD condition, medical expenses, loss of pay, loss of benefits, and other damages for which Col. Gay should be compensated.

## DEMAND FOR JURY TRIAL

Col. Gay demands a jury trial on all issues triable before a jury.

## PRAYER FOR RELIEF

Plaintiff Col. Gay respectfully requests that the Court:

- Order PSS to pay Col. Gay an appropriate amount of back pay with prejudgment interest plus an appropriate amount of front pay, in amounts to be determined at trial;
- Order PSS to pay for any medical expenses that Col. Gay incurred as a result of the hostile work environment created by PSS;
- Order PSS to pay compensatory damages for Col. Gay's future pecuniary losses, including medical expenses, plus non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;
- Order PSS to pay punitive damages for engaging in discriminatory practices with malice or reckless indifference to Col. Gay's federally protected rights;

- Order PSS to pay Col. Gay's reasonable attorney's fees and costs incurred to bring this suit; and
- Award any other relief to Col. Gay that the Court deems just and proper

Dated this 19th day of April, 2016.

/s/ Colin M. Thompson
COLIN M. THOMPSON
Thompson Law Office, LLC
Attorney for Plaintiff, Col. Robert L. Gay